# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3498

_____

United States of America

*Plaintiff - Appellee*

v.

Jason Springer

*Defendant - Appellant*

_____

No. 16-3695

_____

United States of America

*Plaintiff - Appellee*

v.

Rick Makohoniuk

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: June 7, 2017
Filed: August 9, 2017
_____

Before WOLLMAN, ARNOLD, and GRUENDER, Circuit Judges.
_____

ARNOLD, Circuit Judge.

Jason Springer and Rick Makohoniuk appeal their convictions for bank fraud under 18 U.S.C. § 1344(1), raising a myriad of discursive challenges. We affirm the judgment of the district court.[1]

This story begins with two other people—Nathan Smith and Patrick Steven. Smith and Steven created a business to help people who were struggling to repay mortgage-secured loans by negotiating with lenders to modify the terms of those loans. They discovered that some homeowners did not want to modify their loans but wanted instead to escape them by selling their homes and paying off the debt. Many of these homeowners, however, owed more than their homes were worth, so a sale could not satisfy the debt in full. Nonetheless, lenders sometimes allowed homeowners to sell their homes for less than the remaining debt and would accept the proceeds in full satisfaction of the debt. Lenders agreed to these so-called "short sales" partly because of the high costs of foreclosure. So in addition to negotiating loan modifications, Smith and Steven began negotiating short sales with lenders on behalf of cash-strapped homeowners.

Smith and Steven devised a strategy to make money from these short sales: their business would pitch lenders on a short sale by representing that a buyer stood

_____

[1]The Honorable John A. Jarvey, Chief Judge, United States District Court for the Southern District of Iowa.

willing to purchase the property, who, unbeknownst to the lender, would be Smith or Steven. While negotiating the short sale, Smith and Steven would try to find someone to buy the property from them for more than they were going to pay for it in the short sale. Once they found a buyer and received a lender's approval to make the short sale, Smith and Steven would close the short sale and soon after (sometimes on the same day) close on the sale to the buyer they had located and keep the difference. They sold the property quickly so that the proceeds they received selling the property could fund their purchase of the property. So, for example, they would purchase property in a short sale for, say, $50,000, and then immediately resell it for $100,000, and use the proceeds received in the $100,000 sale to fund their $50,000 purchase.

The indictment charged Smith and Steven with bank fraud for misrepresenting and concealing the fact that they had agreements to flip the properties after the short sale. The indictment also charged the appellants for participating in the alleged scheme. Springer was an attorney who allegedly helped Smith and Steven carry out the scheme by closing several of the transactions. He allegedly completed each transaction's HUD-1 settlement statement falsely by representing that Smith and Steven had paid cash at closing when he knew that they had not. Makohoniuk was a real estate agent who the government alleged misrepresented that Smith and Steven did not have an agreement to flip a particular house when he knew that they did. Smith and Steven pleaded guilty and cooperated with the government, but Springer and Makohoniuk opted to take their cases to trial.

Employees for the lenders testified at the trial that the lenders would not have approved the short sales had they known of the property flips because they would have wanted to realize the higher price that the ultimate buyer paid. In fact, many of these lenders had rules to prevent quick property flips after a short sale. For example, many required that the properties be marketed for a certain length of time before they would approve a short sale, which helped ensure that they would receive the best offer possible. To circumvent this requirement, Smith and Steven gave lenders false

listing agreements with real estate agents and false for-sale-by-owner letters purporting to show that the properties had been marketed, when they actually had not. Lenders also required the short sale to be at arm's length. To overcome this hurdle, Smith and Steven would identify a trust as the buyer whose trustee was either Smith or Steven, whichever one was not negotiating with that particular lender. By structuring the transaction this way, Smith and Steven were able to conceal that they were not only negotiating on behalf of the homeowner but also buying the property. Another lenders' rule was that the buyer in the short sale had to demonstrate that it had cash or financing to purchase the property. In response, Smith and Steven provided false statements showing that they had financing to buy the property. At least one lender required a signed affidavit stating that no agreements were in place with other buyers to sell the property immediately after the short sale. Finally, lenders for the ultimate purchaser of the property typically would not approve a loan if the property had changed ownership within a certain amount of time, such as 90 days. To avoid this requirement, Smith and Steven convinced their clients to deed their properties into the trust almost immediately after agreeing to negotiate the short sale on their behalf to make it appear as though ownership had changed much earlier than when the short sale was approved and consummated.

The appellants first maintain that insufficient evidence supports their convictions for bank fraud under 18 U.S.C. § 1344(1), a crime that occurs when someone "knowingly executes, or attempts to execute, a scheme or artifice . . . to defraud a financial institution." Makohoniuk moved for judgment of acquittal on the ground that the government had failed to prove that the entity he defrauded was a "financial institution" under § 1344(1). To be a "financial institution," the entity must be, as relevant here, insured by the FDIC or a "mortgage lending business." 18 U.S.C. § 20(1), (10). The government maintained that the entity Makohoniuk defrauded—GMAC—was indeed a mortgage lending business, that is, "an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such

organizations, and whose activities affect interstate or foreign commerce." 18 U.S.C. § 27. The district court agreed with the government that GMAC was a mortgage lending business and therefore denied Makohoniuk's motion. We review the denial of a motion for a judgment of acquittal based on evidence sufficiency de novo, and we will affirm unless, viewing the evidence in a light most favorable to the government and accepting all reasonable inferences that can be drawn in favor of the verdict, no reasonable jury could have found the defendant guilty. *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014).

The district court concluded that GMAC was a mortgage lending business because a representative from the U.S. Department of Housing and Urban Development testified that, at the time at issue, GMAC was in the mortgage lending business since it had made hundreds or thousands of loans secured by mortgages in 2010 and 2011 in states all across the country. Makohoniuk contends that this testimony falls short of proving that GMAC's activities affect interstate commerce or that GMAC owned this particular loan. We disagree. Construing the testimony in a light most favorable to the government, we think the fact that GMAC made hundreds or even thousands of loans in states throughout the country sufficiently establishes that its activities affect interstate commerce. And we discern no requirement in the definition of "mortgage lending business" that the business own the particular loan in question; it need only finance or refinance any debt secured by an interest in real estate, or, in other words, be in the interstate mortgage lending business in general.

Makohoniuk and Springer raise a somewhat similar but nevertheless different argument on appeal. They maintain that the government failed to establish that the precise corporate entities they were charged with defrauding were "financial institutions." They invoke our decision in *United States v. Alexander* where we vacated a bank fraud conviction under 18 U.S.C. § 1014. 679 F.3d 721, 728 (8th Cir. 2012). There, the defendant stipulated that Bank of America was FDIC insured, but the evidence showed that entities named Bank of America, N.A., and Bank of

America Mortgage were the victims of the fraud. We explained that since the stipulation was the only evidence of FDIC insurance in the case, and it did not mention Bank of America, N.A. or Bank of America Mortgage, the government had failed to establish that the defrauded entities were FDIC insured.

Because Springer and Makohoniuk did not make this argument to the district court, we review for plain error only, *Byers v. United States*, 561 F.3d 832, 836 (8th Cir. 2009), and will reverse only if they show that the district court committed a plain error affecting their substantial rights and seriously affecting the fairness, integrity, or public reputation of judicial proceedings. *United States v. Binkholder*, 832 F.3d 923, 930 (8th Cir. 2016). Springer and Makohoniuk, however, emphasize that we and other courts have labeled this and similar elements as "jurisdictional" because they require a connection to interstate commerce. *See Alexander*, 679 F.3d at 726; *United States v. Ayewoh*, 627 F.3d 914, 917 (1st Cir. 2010). Thus, they contend, the insufficiency of the evidence on this element can be raised anytime and so cannot be subject to mere plain-error review.

But when courts refer to an element connected to interstate commerce as jurisdictional, they are talking about how Congress got power to criminalize certain acts or to legislate over a particular field. *See Torres v. Lynch*, 136 S. Ct. 1619, 1624–25 (2016). In other words, they are talking about legislative jurisdiction. That does not mean that the government's failure to establish a connection with interstate commerce in a particular case deprives the court of jurisdiction over that case. *See United States v. Foster*, 443 F.3d 978, 981 (8th Cir. 2006). It just means the government loses because it failed to prove an element of the offense. We therefore reject Springer and Makohoniuk's argument and review for plain error.

The court in *Alexander* reversed because the government did not prove that the entity stipulated to be FDIC insured was the entity defrauded. Here, however, witnesses testified on each count that the entity for whom they worked was FDIC

-6-

insured (with GMAC being the lone exception, but as already stated, other evidence showed that GMAC was a mortgage lending business), that the defendants' misrepresentations harmed those FDIC-insured entities in their capacities as owners or servicers of the notes, and that the entities would not have acted as they did if they had known about the misrepresentations. In other words, the evidence demonstrates that FDIC-insured entities were the entities defrauded. *Alexander* is simply out of the case, and we see no error here, much less a plain one.

Springer and Makohoniuk next argue that there was insufficient evidence that the appellants intended to cause a financial loss. We have specifically held that the government need not show an intent to cause a financial loss to prove bank fraud under § 1344(1). *United States v. Staples*, 435 F.3d 860, 867 (8th Cir. 2006). Springer and Makohoniuk maintain, though, that a recent Supreme Court decision undermines that case. *See Shaw v. United States*, 137 S. Ct. 462 (2016). There, the Court reviewed a challenge that a conviction under § 1344(1) could not stand because the defendant intended to cheat a bank depositor and not the bank itself. Since the Court made it clear that § 1344(1) "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss," *id.* at 467, we fail to see how *Shaw* calls into question our holding in *Staples*. It is true that the Court said later in the opinion that "[t]he parties agree, as do we, that the scheme must be one to deceive the bank *and* deprive it of something of value," *id.* at 469, but we think it clear that "financial loss" means something narrower than "something of value." The Court in *Shaw* in fact recognized that financial institutions can suffer losses like the right to use property or a chance to bargain knowing all the facts even if the financial institutions get a quid pro quo of appropriate value or do not suffer unreimbursed loss. *Id.* at 467. *Shaw* therefore does not undercut our holding in *Staples*. It supports it.

The appellants similarly maintain that there was insufficient evidence showing that the appellants' scheme subjected the financial institutions to a risk of loss. Assuming that the government must make such a showing under § 1344(1), a point

we need not decide here, we think that it has done so. Each time a financial institution approved a short sale based on misleading information, it relinquished its mortgage interest for less than what it could have if it had known the actual circumstances; therefore, each time the scheme was executed, the financial institution suffered an actual loss, and therefore a risk of one. And there was always the risk that the closing on the second transaction might hit a snag, and so Smith and Steven would not be able to pay for property. Smith testified at trial that, one way they were able to close on property without having funds in hand was by giving a check when they bought the property, even though the account on which the checks were drawn did not contain enough money to cover the check; when they sold the house, they would have money wired into their account before the check was presented for payment. If it had come to light that a check was worthless after the financial institution had already released its mortgage, then the financial institution could face a significant loss. We therefore reject the appellants' argument on this point.

We likewise reject the appellants' related argument that the jury instructions were faulty because they did not mention a risk of loss. Appellants argue that, without a risk-of-loss qualification, the instructions invite bank-fraud convictions for trivial misrepresentations like the day of the week on which a transaction occurred. We disagree that the court's instructions put the appellants at risk of being convicted of bank fraud based on trivial irrelevancies, because the instructions required that the appellants' misrepresentations or factual concealments and omissions be "material," meaning that they must have "a natural tendency to influence, or [be] capable of influencing, the decision of the institution in deciding whether to engage or not to engage in a particular transaction." We are convinced that the "materiality" qualification obviates any fear that the court's instructions could allow the jury to convict the appellants for harmless misrepresentations.

The appellants' contention that the misrepresentations here were not material is meritless. The jury had ample evidence to find materiality because each financial

institution's representative testified that the financial institution would not have approved the short sale had it known the actual circumstances.

The appellants further contend that the government proved facts at trial that differed from the facts it had alleged in the indictment. As part of the Sixth Amendment guarantee that the accused shall "be informed of the nature and cause of the accusation," the government cannot materially vary the proof presented at trial from the allegations in the indictment. *See United States v. Villarreal*, 707 F.3d 942, 962 (8th Cir. 2013). The primary concern is whether the indictment fully and fairly apprised the defendants of the charges they must meet at trial. *United States v. Thomas*, 791 F.3d 889, 897 (8th Cir. 2015).

The indictment here fully and fairly apprised Springer and Makohoniuk of the charges that they would have to contest at trial. The indictment set forth the various misrepresentations and concealments that the appellants had made to further their scheme. After reciting those misrepresentations and concealments, the indictment then set forth each count charged by stating that the relevant defendants executed a scheme to defraud by submitting false HUD-1s. The appellants maintain that they were essentially prepared to contest only the false settlement statements and not the other misrepresentations and concealments despite what the indictment plainly alleged. We do not credit this argument. The indictment merely tracks the statute, which criminalizes the knowing execution of a scheme to defraud a financial institution. *See* 18 U.S.C. § 1344(1). It makes sense that the government would first lay out the broad bank-fraud scheme and then charge the defendants with a count for each time they executed, or capitalized on, that scheme.

We are unable to agree with the appellants' related contention that submission of an aiding-and-abetting instruction was error. They assert that the instruction was inappropriate because, "in light of the irrelevant and prejudicial information in the record, it seems to justify the jury in interpreting the 'scheme and artifice' as

considerably broader than what was charged." But again, the charges were not limited to the false HUD-1s only; the jury could, in fact should, consider the underlying scheme to defraud, which explains how the defendants duped the financial institutions into approving the short sales. For the same reasons, we reject the appellants' argument that the government violated Federal Rule of Evidence 404(b) by admitting evidence of the underlying scheme.

The appellants maintain as well that the HUD-1s themselves were not false. Leaving aside the undeveloped issue of whether the actual execution of the fraudulent scheme must itself be fraudulent, we think that the jury had sufficient evidence to conclude that these HUD-1s were false. The HUD-1s stated that Smith and Steven had brought a certain amount of cash to the settlement when in fact they had not; the money they used to pay for the properties arrived later, after the settlement. By completing the HUD-1s this way, they were able to conceal that they were about to close on a quick flip of the property.

Makohoniuk argues that he had nothing to do with the HUD-1s, so his conviction should be reversed. But Makohoniuk participated in the scheme to defraud by signing an affidavit saying that there was no agreement to flip certain property when he knew otherwise, and then by helping to conceal this misrepresentation. Further, the jury could have found, as the government argued, that Makohoniuk aided and abetted Springer in completing the false HUD-1 by simply participating in the scheme. For these same reasons, we think it entirely proper that the district court did not sua sponte sever his trial from Springer's.

We reject, finally, Makohoniuk's argument that he did not knowingly waive his right to testify at trial. The record shows that the district court advised both defendants of this right and that it was their own decision whether to waive it. Makohoniuk specifically stated that he understood what the court was saying. His

attorney said that they had discussed the matter and decided that he would not testify. The record belies the argument.

Affirmed.

_____