RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0354p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

SHARON HALL,

*Defendant-Appellant*.

> No. 19-5329

───────────────

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:17-cr-00008-1—Gregory F. Van Tatenhove, District Judge.

Argued: February 4, 2020

Decided and Filed: November 10, 2020

Before: SUHRHEINRICH, STRANCH, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Ambrose K. O'Bryan, DUNCAN, GALLOWAY, EGAN GREENWALD PLLC, Louisville, Kentucky, for Appellant. Lauren Tanner Bradley, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Bart L. Greenwald, James L. Adams, DUNCAN, GALLOWAY, EGAN GREENWALD PLLC, Louisville, Kentucky, for Appellant. Lauren Tanner Bradley, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

NALBANDIAN, Circuit Judge. In January 2018, a jury convicted Sharon Hall of eleven counts of bank fraud in violation of 18 U.S.C. § 1344(1) and one count of identity theft in

violation of 18 U.S.C. § 1028A(a)(1). During her trial, Hall admitted that she signed her children's, niece's, and sister's names and altered her sister's paystubs to obtain student loan money. She maintained that she thought all her actions did not violate the law. And she claimed that her family members orally gave her permission to apply for these loans. The jury convicted Hall on all counts.

On appeal, Hall argues that (1) the district court's jury instructions failed to cure the purportedly duplicitous indictment; (2) the government did not produce enough evidence to convict on Counts 11 and 12; (3) the prosecutor's statements during closing argument were flagrant enough to merit a new trial; and (4) the district court erred in denying her leave to file a Federal Rule of Criminal Procedure 33 motion for a new trial. We do not find these arguments convincing, so we **AFFIRM**.

I.

According to Sharon Hall, her family had a "one-for-all, all-for-one" mentality. When one person needed help with money or otherwise, someone always stepped up. In fact, when Hall's sister, Elissa Morgan, had trouble in 2006 with her sixteen-year-old daughter, Lindsay Morgan, Hall took in her niece. Hall was married to Gary Hall, Sr., and they had a daughter, Kerry Lynne Hall (now McKeehan), and a son, Gary Wayne Hall, Jr. Kerry Lynne attended college from 2002 to 2009, Gary Jr. attended college from 2000 to 2009, and Lindsay attended Somerset Community College starting in 2007.

Around 2006 and 2007, Elissa told her niece, Kerry Lynne, that she would cosign two student loans for her. But that was it. Elissa claims she never gave Hall or her niece full permission to go out and obtain any loan they wanted. She insists she only gave permission for the two Kerry Lynne loans. Hall testified that she had permission from Elissa to apply for other student loans.

In 2008, Lindsay claimed she found out that Hall, her aunt, applied for a student loan on Lindsay's behalf when Lindsay logged onto her school account and saw a $30,000 loan. Lindsay's college cost $2,000, not $30,000, so she clicked decline. And when Lindsay called Hall to ask if she knew about that loan, Hall got upset with Lindsay when Lindsay said she

clicked decline.  Hall needed "the loan to go after" a mortgage company "over her house." Lindsay claims that Hall was "very upset" and apparently told Lindsay to move out.  Over time, Lindsay also began realizing that Hall had taken out more loans in Lindsay's name without Lindsay's permission.

Elissa similarly found out about other loans that Hall took out without her permission. Hall listed Elissa as a cosigner on Gary Jr.'s loans and some more of Kerry Lynne's loans. Elissa confronted Hall about these issues, and Hall told Elissa that Hall would pay the loans off with a settlement check that Gary Sr. was receiving from a civil case.  Elissa did not turn Hall in for forging Elissa's signature because Elissa knew Hall would go to jail.  But sometime in 2010 or 2011, Elissa discovered that her credit score was low and realized she was listed on even more loans than she first realized.  When Elissa saw that Hall still failed to make payments on all these loans, even after Gary Sr.'s settlement money came in, Elissa and Lindsay contacted an attorney to help them out of the mess.

A criminal investigator with the Office of Inspector General started looking into this case after receiving witness information about the alleged fraud during another, unrelated investigation.  He found nine loans or loan applications from 2007 or 2008 with Gary Jr., Kerry Lynne, or Lindsay listed as the borrower.  And at least eight of the nine listed Elissa as the cosigner.  The investigator also found a PLUS loan, or "a parent loan," with Elissa listed as the borrower.  The loan listed Kerry Lynne as the student, but Kerry Lynne was not Elissa's daughter.  On top of taking out the PLUS loan, someone also electronically signed a request for forbearance of that loan.  During trial, counsel did not ask about all of Elissa's signatures on the loan documents, but when counsel did ask if someone forged Elissa's signature, the investigator always said yes.

In February 2017, a grand jury indicted Sharon Hall, charging her with eleven counts of bank fraud in violation of 18 U.S.C. § 1344(1)–(2) and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).  Counts 1–10 covered the allegedly fraudulent loan applications that Hall submitted between 2007 and 2008.  Count 10 referred to the PLUS loan with Elissa as borrower.  Count 11 covered the allegedly fraudulent request for forbearance of the PLUS loan that someone submitted with Elissa's electronic signature in March 2012.  Count

12 charged Hall with identity theft based on Count 11, for Hall electronically signing her sister's name. The actions underlying the first ten counts occurred nine to ten years before the indictment. So the government understood them to fall outside the statute of limitations for identity theft.

Defense counsel did not object to the indictment's insufficiency (for duplicity) before trial under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. She first objected to the indictment during the criminal investigator's direct examination on the first day of trial. She argued that the indictment did not allege the *intent* to defraud a bank. Defense counsel said she could discuss the issue later in relation to the jury instructions.

On the second day of trial, Elissa told the jury that she never applied for any of these loans. And she claimed that she did not submit the request for forbearance of the PLUS loan and did not know that Hall was submitting the request by signing Elissa's name. Sure enough, Hall admitted that she forged many of the signatures at issue in the case and that she requested forbearance on the PLUS loan. Hall said that Elissa wanted Hall to fix the situation and that Elissa gave her permission to sign Elissa's name on the request for forbearance. Hall admitted that she electronically signed Elissa's name.

During defense counsel's Rule 29 motion for acquittal at the end of the government's case in chief, she again brought up that the indictment did not sufficiently notify Hall that the government charged her with an intent to defraud a bank, calling it a "fatal variance." (R. 76, Day 3 Tr., PageID 902–07.) The parties also argued about the implications of an incorrect date in the indictment. Despite the prosecutor mentioning potential duplicity during the Rule 29 discussion, Hall's trial counsel did not specifically object to duplicity or argue duplicity.[1]

The next day, when discussing the jury instructions, the government told the district judge that it planned to proceed only with § 1344(1). So that is the only bank fraud provision on

---

[1]Hall's counsel referred to § 1344(1) and (2) as "separate elements," though. And during her Rule 29 argument, she asked for clarification on whether the jury would receive instructions on both § 1344(1) and (2), because she wanted to structure her Rule 29 motion accordingly. At the time, the government said both theories were on the table.

which the district court instructed the jury. During the charge conference, Hall's counsel did not object that the instructions failed to clear up a duplicity issue.

And later that day during closing argument, the prosecutor made several comments with which Hall now takes issue. Hall points to portions of the following excerpt from the prosecutor's closing:

> Now, let me say something while I'm thinking of it. You know, sometimes it's easy to say, "Well, it's just a big old bank. They're not going to miss this money. It's just a big powerful institution, all these conglomerates out there putting together these student loans. It's not really hurting me."
>
> Ladies and gentlemen, let me tell you, student loans, as you know, have high interest rates. And the reason they have high interest rates is because of failures of – to pay back student loans. And it's the Sharon Halls of the world that make that the reality, the people who don't pay it back.
>
> If the banks knew they were going to get paid back, our interest rates would be lower. This is a societal problem. It's not just a bank problem. All of us pay for fraud in the system. And that's why when we find fraud in the system, and we take the time to prove it, we have to follow through and do something about it. It's not an academic issue. It's a real issue.

(R. 77, Day 4 Tr., PageID 1154–55.) And later the prosecutor said:

> And all through this, you can see that Sharon Hall has this belief that student loans grow on – the money for student loans grows on student loan trees somewhere. It's not really anybody's money until it's lent to me. And if it's lent to me, and I don't pay it back, that just means that tree doesn't have any leaves on it. No one's really hurt.
>
> But ladies and gentlemen, there's no – there are no money trees out there. This is money from banks. And interest rates and insurance are high, are – insurance is high because of losses to the banks. All of us pay the premium for fraud on the banks. . . .
>
> You know, there are things that go on in society that somebody needs to do something about . . . prosecutors can prosecute, the witnesses can testify. But after all that's done, if you don't do your job, it doesn't get done. It just doesn't get done . . . [Y]ou are the somebody now . . . You are the somebody. And I ask you to be somebody and do something about this and find the defendant guilty as charged.

(*Id.* at 1165–67.) Finally, during rebuttal, the prosecutor mentioned:

It's like it doesn't matter that the banks aren't paid back, that their money's out there in Suburbans; it doesn't matter to them. Well ladies, and gentlemen, it matters to us and it matters to you. I ask you to find the defendant guilty of bank fraud.

(*Id.* at 1194.) Hall's trial counsel did not object to any of these statements during closing argument.

The jury found Hall guilty on all counts, using a verdict form that did not separate out § 1344(1) and (2) but just generally referred to each count. Two weeks after the trial, Hall's trial counsel filed a Rule 29 motion and moved to withdraw (at Hall's request) that same day. The court allowed counsel to withdraw, and Hall's new counsel for sentencing filed a notice of appearance on February 9, 2018. And additional counsel for her filed notices of appearance on June 15, 2018. The district court ultimately denied the Rule 29 motion on July 2, 2018. Her current counsel (the counsel who filed notices of appearance on June 15, 2018) moved for leave to file a late Rule 33 motion and moved for a new trial under Rule 33 on July 17, 2018. The district court postponed sentencing and on August 17, 2018, denied the motion for leave to file a Rule 33 motion out of time and the Rule 33 motion itself. The court sentenced Hall to twelve months on Counts 1–11 (to run concurrently) and twenty-four months for Count 12 (to run consecutively), for thirty-six months. This appeal followed.

## II.

On appeal, Hall argues (1) a violation of her constitutional right to jury unanimity because of the alleged duplicitous indictment; (2) insufficiency of the evidence for Counts 11 and 12; (3) that the prosecutor violated the "Golden Rule" and made other flagrant statements during his closing; and (4) that the district court abused its discretion by not granting her leave to file a late Rule 33 motion for a new trial.

## A.

First, the duplicitous indictment issue. Hall argues that the indictment is duplicitous because it included both 18 U.S.C. § 1344(1) and (2) in each count related to one loan, rather than separating out § 1344(1) as one count for a particular loan and § 1344(2) as another count for that same loan. If a defendant fails to contest his duplicitous indictment before trial and fails

to challenge the jury instructions in that regard, the court reviews for plain error. *United States v. Gandy*, 926 F.3d 248, 262 (6th Cir. 2019) (citing *United States v. Kakos*, 483 F.3d 441, 445 (6th Cir. 2007)). Since Hall did not contest the indictment pretrial or object to the jury instructions on those grounds, we review under that standard.

"An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *Kakos*, 483 F.3d at 443. Although duplicity is a defense that a party should raise pretrial under Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may challenge a duplicitous indictment any time during trial or on appeal under the argument that the government violated his constitutional right to jury unanimity. *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002). Under the Sixth Amendment, a criminal defendant has a right to a unanimous jury verdict in federal court. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1394 (2020). And a duplicitous indictment threatens that right because a "jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." *Davis*, 306 F.3d at 415 (quoting *United States v. Washington*, 127 F.3d 510, 513 (6th Cir. 1997)).

But a district court can cure unanimous jury concerns brought on by a duplicitous indictment by "requir[ing] the government to 'elect either the count or the charge within the count upon which it will rely,' or . . . 'particulariz[ing] the distinct offense charged in each count' in its jury instruction." *United States v. Hood*, 210 F.3d 660, 663 (6th Cir. 2000). "[P]roper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense." *United States v. Lloyd*, 462 F.3d 510, 514 (6th Cir. 2006).

Counts 1 through 11 charged Hall with violating both 18 U.S.C. § 1344(1) and (2). Under 18 U.S.C. § 1344, an individual commits bank fraud if he:

> [K]nowingly executes, or attempts to execute, a scheme or artifice—
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises[.]

18 U.S.C. § 1344(1)–(2). Assuming that § 1344(1) and (2) are separate offenses requiring separate counts in the indictment, we still find that the jury instructions cured any potential error.

Before closing arguments, the government said that it decided to only pursue § 1344(1). So the district court only instructed the jury on the elements of § 1344(1). Section 1344(1) and (2) overlap to a degree, so some similarities would exist between the potential jury instructions that a judge would give for one or the other. *See Shaw v. United States*, 137 S. Ct. 462, 468 (2016) (noting that § 1344(1) and (2) "overlap substantially" so that conduct may support prosecution under both). But the instructions included no aspect of § 1344(2) that is not also relevant to § 1344(1). Because the government elected to rely on § 1344(1), and the district court only instructed on the elements for § 1344(1), we are not concerned that the jury convicted Hall for anything besides violating § 1344(1). The final jury instructions ultimately remedied any issues—even though the district court's fix seemed coincidental—because the government pursued § 1344(1) only.

## B.

Hall also argues that the government produced insufficient evidence for Counts 11 and 12. Count 11 involves a fraudulent request for forbearance electronically signed with Elissa's name. The forbearance requested a delay of payment for the PLUS loan from Count 10. Count 12 was for identity theft with the request for forbearance. Since Count 12 rises and falls with Count 11, we address Count 11's evidence first.

The parties agree that, when not raised during a Rule 29 motion, as here, this Court should assess a sufficiency of the evidence claim for a manifest miscarriage of justice. *United States v. LaVictor*, 848 F.3d 428, 457 (6th Cir. 2017). We should "only reverse a conviction if the record is devoid of evidence pointing to guilt." *Id.* (quoting *United States v. Guadarrama*, 591 F. App'x 347, 351–52 (6th Cir. 2014)).

To prove bank fraud under § 1344(1), "(1) the defendant [must have] knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) the defendant [must have] had an intent to defraud[;] and (3) the financial institution [must have been] insured by the

FDIC." *United States v. Guzman*, 731 F. App'x 459, 462 (6th Cir. 2018) (quoting *United States v. Kerley*, 784 F.3d 327, 343 (6th Cir. 2015)).

For the first element, "the scheme must be one to deceive the bank and deprive it of something of value." *Shaw*, 137 S. Ct. at 469 (emphasis omitted). But the government need not show that the bank ultimately suffered "financial loss" to establish that the object of the scheme was "something of value." *See id.* at 467, 469; *see also United States v. Springer*, 866 F.3d 949, 954 (8th Cir. 2017) (finding that "'financial loss' means something narrower than 'something of value'" (quoting *Shaw*, 137 S. Ct. at 467, 469)).

Hall argues that insufficient evidence supported her Count 11 conviction because granting forbearance on a loan does not deprive the bank of something of value. We disagree. In *Shaw*, the Supreme Court recognized a loss when someone deprives an individual of "his chance to bargain with the facts before him." 137 S. Ct. at 467 (quoting *United States v. Rowe*, 56 F.2d 747, 749 (2d Cir. 1932)). "The Court in *Shaw* in fact recognized that financial institutions can suffer losses like the right to use property or a chance to bargain knowing all the facts even if the financial institutions get a quid pro quo of appropriate value or do not suffer unreimbursed loss." *Springer*, 866 F.3d at 954 (citing *Shaw*, 137 S. Ct. at 467). A signee putting someone else's name on a request for forbearance deprives the bank of knowing the financial status and ability of the signee to pay back that money. Instead, the bank thinks the person whose name appears is the individual who can stand by paying back the money related to the forbearance request. So the bank loses the "chance to bargain with the facts before [it]," which is something of value. And granting a forbearance deprives the bank of receiving the money, the property, it would otherwise be getting from loan payments during that time. Plus, in general, forbearance is a recognizable form of consideration, Restatement (Second) of Contracts § 71 cmt. d (Am. Law Inst. 1981), and consideration is something of value. All this supports a finding that granting a forbearance request deprives the bank of something of value.

What's more, forbearance agreements have been the focus of § 1344 convictions in our sister circuits. The day the parties argued this case, the Seventh Circuit noted that forbearance agreements constituted executions of a scheme to defraud a bank under § 1344(1). *United States v. LeBeau*, 949 F.3d 334, 346 (7th Cir. 2020). One of the defendants contested the sufficiency of

the evidence, and the court upheld the convictions for the forbearance counts, without even questioning whether granting forbearance deprives the bank of something of value. *Id.* at 346–47.

In *United States v. Colton*, 231 F.3d 890, 894 (4th Cir. 2000), a jury convicted the defendant of several counts of bank fraud and one count of conspiracy to commit bank fraud. Count 5 "charged that [the defendant] executed the scheme by causing the bank to 'execute a Modification and Forbearance Agreement in which Second National released its lien on certain property.'" *Id.* at 909. The Fourth Circuit did not address whether the defendant's problematic forbearance agreement constituted something of value under § 1344(1). *See id.* But, as in *LeBeau*, the forbearance agreement constituted the foundation for a count of bank fraud under § 1344(1).

Hall also argues that the evidence is insufficient as to Count 11 because the indictment mentions obtaining money and requesting a forbearance is not "obtaining money." But the government did not proceed with the § 1344(2) charge, so the jury instructions did not explain "obtaining money" or the other provisions required to satisfy § 1344(2). Thus, little concern exists over whether the jury read "obtaining money" from the original indictment into the jury instruction for § 1344(1). *See Davis*, 306 F.3d at 416 ("Juries are presumed to follow the instructions they are given.").[2]

For these reasons, a jury could properly interpret a bank's grant of forbearance as depriving the bank of something of value. So sufficient evidence existed to convict on Count 11.

_____

[2]Hall also tries to analogize bankruptcy cases describing "new value" to bank fraud cases, which require depriving the bank of "something of value." The phrase "new value" comes from Title 11 of the United States Code, which refers to bankruptcy, not Title 18, referring to crimes and criminal procedure. In her attempt to analogize, Hall cites the following statutory provision:

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation[.]

11 U.S.C. § 547(a)(2). New value does not mean the same thing as something of value. "New" implies something that did not exist or was not attained before. So it makes sense why "new value" would not include "an obligation substituted for an existing obligation[.]" "Something of value" is not so limited. Indeed, by limiting what constitutes "new" value, the bankruptcy definition itself suggests that "value," even in the bankruptcy context, is a broader concept.

Count 12 charged Hall with aggravated identity theft under 18 U.S.C. § 1028A(a)(1):

Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

Because Hall admitted that she electronically signed Elissa's name on the forbearance request from Count 11, we do not disturb the jury's Count 12 identity theft conviction either.

C.

Next, we address Hall's argument that the prosecutor engaged in prosecutorial misconduct meriting reversal of her conviction based on some remarks he made during closing argument.

When a defendant fails to object to alleged prosecutorial misstatements at trial, as was the case here, we review for plain error. *United States v. Modena*, 302 F.3d 626, 634 (6th Cir. 2002). "Plain error is '(1) error (2) that was obvious or clear, (3) that affected [the] defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Wells*, 623 F.3d 332, 337 (6th Cir. 2010) (quoting *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).

And when analyzing claims of prosecutorial misconduct, we follow a two-step framework. First, we decide whether the prosecutor's statements were improper enough to constitute plain error. *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). If they were, we then determine whether the statements were flagrant enough to affect the defendant's substantial rights. *Id.* at 784. If the defendant makes these two showings, we may then address the fairness and integrity of the judicial proceedings. *Id.*

The flagrancy analysis consists of four factors (the *Carroll* factors): "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.* (citing *Carroll*, 26 F.3d at 1385). If we find that the statements are not flagrant, we

may still reverse if (1) "proof of his guilt was not overwhelming," (2) "he objected to the improper remarks," and (3) "the court failed to cure the error with an admonishment to the jury." *Carroll*, 26 F.3d at 1390.

1.

Hall first contests the prosecutor's statements during closing that implied the jurors themselves were victims of bank fraud.  He noted that interest rates are high, and then at two points said:  "[a]ll of us pay for fraud in the system" and "[a]ll of us pay the premium for fraud on the banks."  (R. 77, Day 4 Tr., PageID 1155, 1165.)

Asking jurors to place themselves in the victim's shoes violates the ban on Golden Rule arguments.  *United States v. Al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015).  A prosecutor cannot "urge[] jurors to identify individually with the victims with comments like 'it could have been you' the defendant [harmed] or 'it could have been your children.'"  *Id.* (second alteration in original) (quoting *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009)).  Encouraging such "juror identification with crime victims [is] improper."  *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008) (citing *Hodge v. Hurley*, 426 F.3d 368, 384 (6th Cir. 2005)).

The closing prosecutor here did not necessarily ask the jurors to identify with the victims in the case but went a step further and called *them* the victims of Hall's crime.  He urged the jurors to avoid thinking that fraud like Hall's is "not really hurting me" and stated that everyone pays for fraud in the system.  (R. 77, Day 4 Tr., PageID 1154–55.)  That plea is no doubt improper.  *See United States v. Roman*, 492 F.3d 803, 806 (7th Cir. 2007) (emphasizing that "a 'Golden Rule' appeal in which the jury is asked to put itself in the defendant's position 'is *universally recognized as improper* because it encourages the jury to depart from . . . neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence" (emphasis added) (quoting *United States v. Teslim*, 869 F.2d 316, 328 (7th Cir. 1989)).  So we look at the four flagrancy factors to see if the prosecutor's improper arguments merit reversal.

*Prejudice.*  A statement's impropriety does not necessarily render it prejudicial.  *Irick v. Bell*, 565 F.3d 315, 326 (6th Cir. 2009).  "If it did, there would be no need for a two-step inquiry."  *Id.*  But as noted, Golden Rule arguments have the tendency of encouraging the jury to

make decisions based on "personal interest and bias rather than on the evidence." *Roman*, 492 F.3d at 806 (quoting *Teslim*, 869 F.2d at 328).

One question relevant to this factor is whether the district court gave a curative instruction to alleviate any potential prejudice that the prosecutor's remarks may have caused. *Carter*, 236 F.3d at 787 (citing *Carroll*, 26 F.3d at 1385). We have noted before that general curative instructions, given during final jury instructions, may suffice to clear up any prejudice. *See Cherry v. Jago*, 722 F.2d 1296, 1300 (6th Cir. 1983) ("Although the government admits that the prosecutor's argument was improper, we find that it could have had no significant effect on the fairness of the trial, in light of the judge's cautionary instructions and the isolated nature of the remarks."); *id.* (finding that cautionary instructions cured any prejudice caused by the prosecutor's "appeal[] to community interests, passion[,] and public policy"); *United States v. White*, 563 F.3d 184, 195 (6th Cir. 2009) (concluding that instructions about the presumption of innocence before openings and during final instructions after closings cured any prejudice from the prosecutor's burden of proof comments).

But we have also found that general curative instructions given after closings, and not right after the prejudicial statements, might not cure their prejudicial impact. *See, e.g.*, *Carter*, 236 F.3d at 787 (finding that a general curative instruction that "arguments made by the lawyers are not evidence" failed to cure prejudice because it was a routine instruction given after closings and a recess and did not address the prosecutor's statements). Whether the curative instructions single out specific comments made by the prosecution is relevant. *See United States v. Acosta*, 924 F.3d 288, 308–09 (6th Cir. 2019) (holding that a "general instruction" "given only after closing arguments had been completed" telling the jury that arguments and statements by lawyers are not evidence did not remedy the statement's prejudicial effect) (citations and internal quotation marks omitted); *United States v. Warshak*, 631 F.3d 266, 306 (6th Cir. 2010) (curative instruction explicitly referencing the prosecutor's comments cured potential prejudice). And the timing of such a curative instruction, whether it occurs immediately or only during jury instruction, is also relevant. *See Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007) (lack of "a prompt, curative instruction in response to the highly prejudicial statements" can lead to a "very strong likelihood that [the] prosecutor's prejudicial statements misled the jury"); *United States v.*

*Johnson*, 581 F.3d 320, 330 (6th Cir. 2009) (a "quickly issued" curative instruction makes it "highly unlikely that improper comments misled the jury") (citing *United States v. Wilson*, 199 F. App'x 495, 498 (6th Cir. 2006)).

Here, the district judge's curative instructions came after closings. "[D]o not let any bias, sympathy, or prejudice that you may feel towards one side or the other influence your decision in any way," and "[t]he parties' statements and arguments are not evidence." (R. 77, Day 4 Tr., PageID 1196, 1198.) Because the district court neither explicitly addressed the potentially prejudicially statements nor offered any curative instruction until after closing arguments had ended, we conclude that this factor favors Hall.

*Isolation.* On the one hand, this court has found that three statements during closing made the remarks "a central theme in the prosecutor's closing," and "were some of the last statements heard by the jury before deliberations." *Girts*, 501 F.3d at 760. Because of that, we concluded that "[t]he multiple statements amplified the prejudicial effect" and were not isolated. *Id.*

But on the other hand, we have also found that comments made only during closing argument can be isolated. *See, e.g.*, *Stewart v. Trierweiler*, 867 F.3d 633, 641 (6th Cir. 2017) (finding that remarks made only during closing argument after a four-day trial constituted "isolated comments"); *United States v. Farah*, 766 F.3d 599, 615–16 (6th Cir. 2014) (concluding that "[t]he prosecutor's statements were isolated, occurring only twice during the entirety of his closing argument").

Here, the prosecutor commented twice about how bank fraud affects everyone and how we all pay for fraud in the system. And during rebuttal he said, "[i]t's like it doesn't matter that the banks aren't paid back . . . Well[,] . . . it matters to us and it matters to you," which arguably implies a third reference to the jurors as victims. (R. 77, Day 4 Tr., PageID 1194.) The prosecutor isolated these remarks to only one portion of trial—the closing. And his statements did not so permeate the eighteen-page closing and seven-page rebuttal to give us the impression that they were not isolated. On balance, this factor favors the government.

*Deliberate.* Often, this court has found prosecutorial statements deliberate when they are repeated because that shows that the errors were not "inadvertent slip[s] of the tongue." *Acosta*, 924 F.3d at 307. Even more importantly, though, the deliberate inquiry considers any "indication that [the statements] stemmed from a deliberate plan to inflame the jury as opposed to unduly-zealous advocacy." *United States v. Carson*, 560 F.3d 566, 577 (6th Cir. 2009) (quoting *United States v. Shalash*, 108 F. App'x 269, 281 (6th Cir. 2004)). Here, the prosecutor's point about fraud in the system seemed deliberate because he mentioned it more than once. Yet nothing about these statements suggests anything more than "unduly-zealous advocacy." So this factor does not favor one party over the other.

*Strength of the Evidence.* The final factor, no doubt, favors the government. At trial, Hall admitted to signing Elissa's name on multiple loan applications. Elissa denied giving Hall permission to apply for more than two loans. Elissa also explained how Hall pretended to act as Elissa and sent letters to the banks in Elissa's voice. The evidence of bank fraud against Hall was overwhelming.

\* \* \*

Given our analysis of the factors, we find that the prosecutor's statements were not flagrant. As mentioned, since we find that the statements were not so flagrant to merit reversal, we can only reverse if (1) "proof of his guilt was not overwhelming," (2) "he objected to the improper remarks," and (3) "the court failed to cure the error with an admonishment to the jury." *Carroll*, 26 F.3d at 1390. But the defense did not object and overwhelming proof of guilt existed.

For these reasons, "[w]hile we do not condone the government's comment[s], we hold that [they were] not reversible error." *Teslim*, 869 F.2d at 328.

2.

Hall also contests the prosecutor's closing comments relating to harm to society. We have said before that "[n]othing prevents the government from appealing to the jurors' sense of justice, or from connecting the point to the victims in the case." *United States v. Boyd*, 640 F.3d

657, 670 (6th Cir. 2011) (alteration in original) (quoting *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009)). And prosecutors can appeal to jurors' duty to the community. *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004). "Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). As we discussed above, "the prosecution may not urge jurors to identify individually with the victims with comments like 'it could have been you,' or 'fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community.'" *Boyd*, 640 F.3d at 670 (quoting *Bedford*, 567 F.3d at 234). In *Solivan*, one of the most cited cases in this circuit regarding attorney appeals to the community conscience, we explained:

> The fairness or unfairness of comments appealing to the national or local community interests of jurors in a given instance will depend in great part on the nature of the community interest appealed to, and its relationship to, and the nature of, the wider social-political context to which it refers. The correlation between the community interest comments and the wider social-political context to a large extent controls the determination of whether an appeal is deemed impermissible because it is calculated to inflame passion and prejudice.

937 F.2d at 1152. For example, we have found appeals to community interests improper when they relate to drug problems. *Id.* at 1155; *United States v. Roberts*, 986 F.2d 1026, 1031–32 (6th Cir. 1993) (implying the same).

Here, the prosecutor's statements related to "society" were not improper. The prosecutor permissibly appealed to the jurors' responsibility as members of a community by saying that the responsibility is now in their hands. And even though he also referred to bank fraud's possible effect on society, such as higher interest rates and insurance premiums, these statements do not rise to the level of suggesting a "crime wave or some other calamity." *Boyd*, 640 F.3d at 670. We find that the prosecutor's comments about the effect on society were not so improper to merit a flagrancy analysis, let alone reversal. And because Hall never objected to this comment either, we would be hard-pressed to say that any error was plain under an analysis like the one above.

3.

Finally, Hall contests the prosecutor's statement during rebuttal in which he said that the bank's money is "out there in Suburbans." (R. 77, Day 4 Tr., PageID 1194.) She says this is a misrepresentation of evidence, since testimony came in at trial that Hall's husband bought Suburbans with money he received from a civil settlement, not from the money received from the student loans. Like the other inappropriate prosecutorial remarks during closing, the defense did not object at the time of the remark.

"[I]t is improper for attorneys, especially prosecutors who generally have the confidence of juries, to misstate evidence[.]" *Carter*, 236 F.3d at 785. So we agree that this statement from the prosecutor was also improper. But this statement is the least flagrant of the ones that Hall contests. It was isolated to a mere half sentence during the prosecutor's summation, and we do not read it as a deliberate attempt to inflame the jury. In fact, we find little distinction between the statement that the bank's money is "out there in Suburbans" and "the Halls didn't use thousands of dollars in settlement money to pay the banks back, but instead bought Suburbans." Only the second statement is an accurate description of the evidence, but the implications from both statements are the same. So the statement did not tend to mislead the jury or prejudice the defendant. Plus, we have explained how the evidence against Hall was strong. Thus, the prosecutor's misstatement of evidence was not flagrant enough to warrant reversal.

D.

Hall also argues the that district court improperly denied her leave to file a later Rule 33 motion. When the district court grants (or denies) leave to file a Rule 33 motion due to excusable neglect (or lack thereof), we review that decision for an abuse of discretion. *United States v. Munoz*, 605 F.3d 359, 366 (6th Cir. 2010). Abuse of discretion means a district court "relie[d] on clearly erroneous findings of fact, improperly applie[d] the law, or use[d] an erroneous legal standard." *Id.* (quoting *United States v. Washington*, 584 F.3d 693, 695 (6th Cir. 2009)).

Under Federal Rule of Criminal Procedure 33(a), a defendant can move for a new trial "if the interest of justice so requires." The defendant must file the motion within fourteen days of

the guilty verdict, unless the motion hinges on newly discovered evidence. Fed. R. Crim. P. 33(b).

But even if the defendant moves for a new trial outside fourteen days and without new evidence, the district court can grant the motion if it finds "excusable neglect." Fed. R. Crim. P. 45(b). This circuit adopted the *Pioneer* factors for assessing excusable neglect under Rule 33:

> (1) the danger of prejudice to the nonmoving party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, (4) whether the delay was within the reasonable control of the moving party, and (5) whether the late-filing party acted in good faith.

*Munoz*, 605 F.3d at 368 (quoting *Nafziger v. McDermott Int'l, Inc.*, 467 F.3d 514, 522 (6th Cir. 2006)).

In *Munoz*, 605 F.3d at 366, and *United States v. Elenniss*, 729 F. App'x 422 (6th Cir. 2018), this court assessed potential excusable neglect in filing a late Rule 33 motion because of alleged ineffective assistance of counsel. In *Munoz*, trial counsel continued to represent the defendant for two to three months after the trial, which included the fourteen-day window for filing a Rule 33. 605 F.3d at 365. Only five days after the defendant's new counsel entered the scene, she informed the district court that she planned to file a motion for a new trial under Rule 33. *Id.* The defendant's new counsel then filed the motion for a new trial under Rule 33 ten to eleven weeks after the defendant retained her. *Id.* at 366. In *Elenniss*, the defendant's trial counsel represented him for two-and-a-half months after the verdict, and his new counsel represented him for another two months before filing a Rule 33 motion. 729 F. App'x at 424.

In *Munoz*, the court found excusable neglect, 605 F.3d at 372–73, and in *Elenniss*, the court did not, 729 F. App'x at 428. We analyze the specific reasoning from both cases under each *Pioneer* factor below.

*Reason for Delay.* In *Munoz*, the court noted that *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993), presented a "your lawyer, your fault" principle. 605 F.3d at 369. In other words, defendants are bound by the mistakes of their lawyers. *Id.* But *Munoz* distinguished *Pioneer*, noting that *Pioneer* was a bankruptcy case, and defendants should not be as bound by their attorneys' actions in the criminal context. *Id.* at 369–70. What's more,

defendants should not be so bound by their lawyers' conduct when that conduct consists of "egregious acts and omissions." *Id.* at 370. The court found that representation by allegedly ineffective counsel is a justifiable reason for delay in filing a Rule 33 motion. *Id.* at 371. Under this factor, the court did not comment on the additional ten-week delay after retaining new counsel, presumably because the defendant's new counsel sought leave to file the Rule 33 motion only five days after the defendant retained her.

In *Elenniss*, the court emphasized this key difference from *Munoz*. In *Elenniss*, the defendant's new counsel did *not* seek leave to file the Rule 33 motion shortly after taking the case. 729 F. App'x at 425. So the court found that no justifiable reason existed for the additional two-month delay after the defendant retained new counsel because, unlike in *Munoz*, the district court had no indication that more post-trial motions were coming. *Id.* The defendant's new counsel filed a motion related to sentencing soon after taking the case. *Id.* at 425–26. This suggested to the district court that everyone was moving along toward sentencing. *Id.* at 426. Plus the court received no notification from the defendant's new counsel about an intent to file a late Rule 33 motion until he actually filed the motion two months after taking over. *Id.* So the court found no justifiable reason for the additional eight-week delay *after* the defendant retained new counsel. *Id.* Unlike in *Munoz*, there was a significant delay in seeking leave to file the motion after the newly retained counsel took over. *Id.* at 425–26.

Hall's case is more analogous to *Elenniss* than *Munoz*. Because Hall retained new counsel on February 9, 2018, and because counsel did not convey soon after that Hall sought leave to file other post-trial motions, Hall no longer had the justification that alleged ineffective counsel was causing the delay. What's more, just like in *Elenniss*, Hall's new counsel filed a motion related to sentencing in the interim before the Rule 33 motion, further suggesting to the district court that everyone was proceeding along toward sentencing. Unlike in *Munoz*, when the court received notification of an intent to file a Rule 33 motion five days after new counsel came onboard, the district court did not receive any notice until over five months after Hall's first new counsel filed his notice of appearance. While we are sympathetic that Hall retained her new counsel for sentencing and not appeal, that counsel could have filed a Rule 33 motion himself or urged Hall to get another attorney for late post-trial motions.

Hall argues that the reason for her delay was that she did not know her counsel was ineffective until the district court denied her Rule 29 motion on July 2, 2018. Similarly, she argues that the time for filing the motion was equitably tolled. She says the district court should have excused her for not filing the motion before the denial of her Rule 29 motion on July 2, 2018, because that is the day the ineffective assistance of counsel claim arose. In other words, if Hall had won on July 2, 2018, then she would not have had to raise an ineffective assistance of counsel claim through a Rule 33 motion.

But an ineffective assistance of counsel claim would have arisen just after the guilty verdict. The Rule 29 outcome did not change the alleged ineffective assistance given months before. Hall's new attorney could have recognized the alleged ineffective assistance as soon as he reviewed the file in February, even if Hall only hired him for sentencing purposes. He would have reviewed the file for sentencing and just as easily could have notified the court that he needed to file a Rule 33 motion or that his client needed time to retain another attorney to file a Rule 33 motion on her behalf. In other words, Hall knew about the supposed duplicitous indictment and other allegedly prejudicial issues relevant to the Rule 33 motion as soon as the judge read the verdict. That's when she was prejudiced. Thus, Hall's argument that July 2 is the date she learned of her prejudice is inapplicable here because Hall knew months before about (1) the alleged poor trial counsel performance and (2) the supposed prejudice because of that performance (by her guilty verdict). Thus, Hall's reason for delay—the most important factor, *Munoz*, 605 F.3d at 372—does not clearly weigh in her favor.

*Danger of Prejudice to the Government.* In *Munoz*, the court noted that the proper question for this factor is how much the government will be prejudiced from having to retry the case after the delay. 605 F.3d at 371 n.6. The court noted that a six-month delay is not enough to create enough prejudice in retrying a case, at least as it relates to witnesses retaining their memories. *Id.* at 371. And in *Elenniss*, the court found that the government did not suffer prejudice because the government still would have had to respond to the motion and prepare for sentencing if the defendant had filed the motion on time. 729 F. App'x at 426. It just would have done so in a different order. *Id.*

Because six months is not enough to create prejudice in retrying Hall's case, since the government would have had to respond to the Rule 33 motion even if Hall submitted it on time, and because the government would have had to prepare for sentencing no matter what, this factor weighs in Hall's favor.

*Length of the Delay and the Potential Impact on Judicial Proceedings.* In *Munoz*, the defendant's new counsel took ten to eleven weeks after taking over the case before filing the Rule 33 motion. 605 F.3d at 372. The court found that this delay was not too long, given that the defendant's allegedly ineffective trial counsel may not have cooperated with the defendant's new counsel. *Id.* The court also reasoned that "a district judge is in the best position to know how long a diligent successor counsel would require to research and prepare a new-trial motion under the circumstances presented by any given case." *Id.* And the district court had determined before that the delay was not inordinate, given the unique circumstances of the case. *Id.* Finally, the court noted that no judicial resources had been wasted because the defendant had not yet been sentenced, and no appeal had occurred. *Id.* at 372 n.7

In *Elenniss*, the defendant only took around eight weeks to file the Rule 33 motion after retaining new counsel, compared to the ten to eleven weeks it took the defendant in *Munoz*. 729 F. App'x at 427. But in *Elenniss*, the court found that this factor did not clearly support the defendant, despite taking a shorter amount of time, because, unlike in *Munoz*, the defendant's new counsel did not seek leave to file the late motion shortly after the defendant retained her. *Id.* What's more, the court pointed to the language in *Munoz* that the district court "is in the best position to appreciate what amounts to an 'inordinately' long delay," given the circumstances of the case and arguments to craft. *Id.* The district court in *Elenniss* found the delay to be too long, so the panel relied on that finding, too, to find that the factor did not clearly support the defendant. *Id.*

Here, we first note that Hall's new counsel filed a notice on February 9, 2018. A few more attorneys representing Hall filed notices on June 15, 2018. Then they requested leave to file the new motion on July 17, 2018. So from February 9, 2018, to July 17, 2018, Hall had new counsel who could have made additional arguments in a Rule 33 motion. That delay was far

longer than either of the delays in *Munoz* and *Elenniss*, which alone supports a finding that this factor does not favor Hall.

Hall's new counsel, who filed a notice on February 9, 2018, specifically said Hall retained him for her sentencing hearing and not any appeal. But still, five months went by in which Hall's allegedly ineffective trial counsel no longer represented her, and that period far outweighs the delays in *Munoz* and *Elenniss*.

Even assuming the delay was closer to eight or eleven weeks, like the time periods in the two cases, Hall's situation fits the reasoning from *Elenniss* more than *Munoz*. Hall's counsel did not seek leave to file a delayed Rule 33 motion shortly after filing a notice of appearance, and the district court here also found the delay to be "inordinate," just like in *Elenniss* and unlike in *Munoz*.

Yet we find that the impact on judicial proceedings was minimal. Although Hall was only a week away from sentencing when her newest counsel filed the Rule 33 motion, the district court had not yet sentenced Hall, and no appeal had occurred. This factor does not clearly favor Hall.

*Reasonable Control over the Delay.* In both *Munoz* and *Elenniss*, the court found that the defendants had no reasonable control while their allegedly ineffective counsel still represented them. *Munoz*, 605 F.3d at 369–71; *Elenniss*, 729 F. App'x at 426. But as the court noted in *Elenniss*, the defendant had reasonable control over any delay *after* he obtained new counsel. 729 F. App'x at 426. Hall had new counsel for over five months. She had reasonable control over that five-month period during which trial counsel was no longer in the picture. So this factor does not weigh in Hall's favor.

*Good Faith.* In *Munoz*, the parties did not contest that the defendant acted in good faith, so the factor weighed in the defendant's favor. 605 F.3d at 372. In *Elenniss*, the court ultimately found no bad faith in filing the late Rule 33 motion because the "motion for a new trial and the grounds on which it was brought had never been made, heard, or decided prior to th[at] filing." 729 F. App'x at 428. But the court also noted that a likely duplicative, non-meritorious

argument would not have mean the defendant necessarily acted in bad faith either. *Id.* So the factor weighed in the defendant's favor. *Id.*

Here too, nothing reveals that Hall acted in bad faith. In her motion for a new trial, Hall made four arguments on the merits, but she also overlaid each argument with points about trial counsel's ineffective assistance. So she brought her motion on grounds which "had never been made, heard, or decided prior to th[at] filing." *Id.* "Aside from its tardiness, [the defendant] had every right to file this motion." *Id.* This factor favors Hall.

\* \* \*

While some factors favor Hall, most factors, including the most important factor, do not clearly weigh in her favor. Given that we review for an abuse of discretion, we cannot say that the district court erred in finding no excusable neglect and denying Hall leave to move for a new trial.

### III.

We hold that the jury instructions cured any duplicitous indictment concerns, sufficient evidence supported Hall's convictions for Counts 11 and 12, some of the prosecutor's statements, though improper, were not flagrant enough to merit reversal, and the district court did not abuse its discretion in denying Hall leave to move for a new trial. We **AFFIRM**.