NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0027n.06

Nos. 19-3515/3550

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>TRACIE HUNTER,</td><td>)</td><td rowspan="13"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Petitioner-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>OFFICE OF THE OHIO ATTORNEY</td><td>)</td></tr>
<tr><td>GENERAL; HAMILTON COUNTY COURT</td><td>)</td></tr>
<tr><td>OF COMMON PLEAS; HONORABLE</td><td>)</td></tr>
<tr><td>PATRICK DINKELACKER,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td style="padding-left:2em">Respondents-Appellees.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Jan 18, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

Before: GILMAN, KETHLEDGE, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. A former state court judge, convicted of having an unlawful interest in a public contract, claims that she was prosecuted for political ends. She made that argument to the jury. And she made that argument to the state courts on appeal. Her sentence served, she makes that argument again on habeas review.[1] But only a single legal issue is before us: whether four remarks the prosecutor made during closing arguments rendered the trial

_____

[1] One might reasonably wonder how we have jurisdiction over this case. Only a "person in custody" may seek habeas relief from a state court judgment, 28 U.S.C. § 2254, but Hunter is no longer in jail. Three principles answer this question. First, we determine "custody" at the time of filing. *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Second, a petitioner is "in custody" when her sentence is stayed. *See McVeigh v. Smith*, 872 F.2d 725, 727 (6th Cir. 1989). And third, a habeas case is not moot if there are still "collateral consequences," which we presume in the case of a criminal conviction. *Spencer v. Kemna*, 523 U.S. 1, 8 (1998). Here, when the petition was filed in 2016, Hunter's felony sentence had been stayed. So we have jurisdiction.

inconsistent with due process. The state court reasonably concluded that they did not. Therefore, we AFFIRM the district court's judgment denying the petition for a writ of habeas corpus.

I.

A.

Tracie Hunter was a judge on the Hamilton County Juvenile Court. Her brother, Steven, worked as a corrections officer at the same court's Youth Center. The events leading to Hunter's conviction began on July 7, 2013, when Steven allegedly hit one of the residents at the Center. The Center's superintendent recommended that the court fire Steven over the incident.

On the day that Steven learned that he might be fired, Tracie Hunter sent an email to employees at the Center, identifying general safety concerns, and scheduling a closed meeting to discuss those issues with the corrections officers. The Center's superintendent was troubled by the email, both because of its timing and because many of its points echoed the explanations Steven had given for the July 7 incident. He thought that the email was Hunter's way of inserting herself into the proceedings.

A few days later, Hunter sent a second email, asking the superintendent for every report and drug test related to the Youth Center resident whom Steven had allegedly hit. The superintendent found the request unusual and asked Hunter to clarify whether she wanted the July 7 incident report only or also all the "other documents related to our investigation." Hunter responded that she wanted "all documentation of every incident and every employee" related to the youth. Hunter then passed the documents along to her brother, who gave them to his attorney. The attorney accepted some of the documents but refused others because it would have been "unethical." Steven was eventually fired.

Hunter was indicted for her role in these events. The charge, for having an unlawful interest in a public contract, was tried to a jury along with eight other counts—one relating to her brother's employment, four counts of forgery and evidence tampering relating to her alleged backdating of court documents, and three counts for theft and misuse of a government credit card.

The theme of Hunter's defense in the lengthy and contentious trial was that the entire prosecution was politically motivated. In Hunter's view, the prosecutor's office had a long-standing vendetta against her that began when she successfully contested the results of her judicial election; in that litigation, the prosecutor's office had represented her adversary, the Board of Elections. The animosity grew, according to Hunter, when she later filed a grievance against the prosecutor's office, and several of its individual attorneys, charging them with professional conflicts of interest and other ethical violations.

At the end of Hunter's criminal trial, the jury hung on eight counts and convicted her on the single count of having an unlawful interest in her brother's employment contract. The trial judge sentenced her to six months in jail and one year of community control.

B.

Following the verdict, Hunter began a protracted appeals process. First, she went to the state appeals court and argued that the evidence wasn't sufficient to convict her, that the trial court should have polled the jury, and that the special prosecutor had made 51 inappropriate statements, amounting to prosecutorial misconduct. The state court rejected her claims. On prosecutorial misconduct, the court found that Hunter had failed to object to nearly all the statements at trial and had forfeited all but plain-error review. The court went on to review the 51 statements and concluded that no due process violation had occurred because Hunter had opened the door to many

of them and because the trial court had repeatedly admonished the jury that closing arguments were not evidence. Hunter sought review at the Ohio Supreme Court, which declined jurisdiction.

Hunter timely petitioned for a writ of habeas corpus in federal district court. The magistrate judge recommended that the petition be denied but that a certificate of appealability issue, limited to the preserved prosecutorial-misconduct claims. The district judge adopted the report and recommendation in its entirety. Hunter filed a timely notice of appeal.[2]

## II.

*Standard of review*. We review the district court's legal conclusions de novo. *Chase v. Macauley*, 971 F.3d 582, 591 (6th Cir. 2020). When a state court has adjudicated a habeas petitioner's claim "on the merits," the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) instructs us not to disturb that decision unless it was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). The district court hesitated to apply AEDPA deference here because the state court invoked plain error when reviewing Hunter's prosecutorial-misconduct claim. "[I]n light of potentially ambiguous Sixth Circuit precedent on" the appropriate standard of review, the magistrate judge had reviewed the misconduct claim de novo. And, although the district court thought it "counterintuitive" that de novo review would apply in this context, the district court likewise "err[ed] on the side of caution" and reviewed Hunter's claim de novo. That caution was unnecessary. Following *Stewart v. Trierweiler*, AEDPA deference "applies to a state court's plain-

---

[2] The Hamilton County Court of Common Pleas and Judge Patrick Dinkelacker originally filed a cross-appeal but now concede that this court lacks jurisdiction to entertain it because it "does not seek a change in the relief ordered by the judgement appealed from." *Hensley v. Gassman*, 693 F.3d 681, 686 (6th Cir. 2012) (quoting *Wheeler v. City of Lansing*, 660 F.3d 931, 939 (6th Cir. 2011)).

error analysis if it 'conducts any reasoned elaboration of an issue under federal law.'" 867 F.3d 633, 638 (6th Cir. 2017) (quoting *Fleming v. Metrish,* 556 F.3d 520, 531 (6th Cir. 2009)). Here, there can be no doubt that the state court did just that. So the state court's plain-error review of Hunter's prosecutorial misconduct claim counts as an adjudication on the merits for purposes of § 2254(d), and AEDPA deference applies.

*The prosecutor's statements.* On appeal, Hunter objects to four prosecution statements, claiming they were so inflammatory as to render her trial constitutionally deficient.[3] The state court of appeals found that these statements were invited by the defense and, in any case, were cured when the trial court repeatedly told the jury that closing arguments are not evidence. The state court noted that the trial was "long and intense" and that the "closing arguments of both sides were equally intense." The court concluded that although some of the prosecutor's statements might have "stretched the bounds of what is acceptable," the statements did not deprive Hunter of a fair trial. That judgment was not an unreasonable application of clearly established Supreme Court caselaw.

The Supreme Court has told us that the touchstone of a prosecutorial-misconduct claim is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (cleaned up). This is a "very general" standard, so courts have leeway when resolving such claims. *Parker v. Matthews*, 567 U.S. 37, 48 (2012). And "[t]hat leeway increases in assessing a state court's

---

[3] The district court granted a certificate of appealability for 16 statements. But Hunter acknowledges that just "[f]our of the special prosecutor's specific remarks are at issue in this case." Any challenges to the remaining statements—which below were mostly about burden-shifting or referencing unsworn statements as evidence—are forfeited. *See Courser v. Allard*, 969 F.3d 604, 621 (6th Cir. 2020).

ruling under AEDPA." *Stewart*, 867 F.3d at 638–39. So Hunter must clear a high bar to obtain relief.

To clear that hurdle, it is "not enough" to show "that the prosecutors' remarks were undesirable or even universally condemned." *Darden,* 477 U.S. at 181. In *Darden*, the prosecutor asked the jury to impose the death penalty because "[t]hat's the only way I know that [the defendant] is not going to get out on the public." *Id.* at 180 n.10. The prosecutor referred to the defendant as an "animal" that should be kept on a leash. *Id.* at 180 n.11. And he wished that he could see the defendant "sitting here with no face, blown away by a shotgun." *Id.* at 180 n.12. Still, the Court found that the petitioner had not been deprived of a fair trial because "much of the objectionable content was invited by or was responsive to the opening summation of the defense," the "trial court instructed the jurors several times . . . that the arguments of counsel were not evidence," and "the weight of the evidence against petitioner was heavy." *Id.* at 182.

Although some of the statements in Hunter's trial might have pushed the bounds of professionalism, the state court did not defy Supreme Court precedent by concluding that Hunter's trial was fundamentally fair despite them. The state court reasonably concluded that each of these remarks was "invited," and did no more than "right the scale." *United States v. Young*, 470 U.S. 1, 12–13 (1985). The state court also noted that the trial court had repeatedly cautioned the jury not to consider counsel's argument as evidence. And the state court rejected Hunter's arguments that her actions did not constitute criminal behavior under the statute, finding that the record supported her conviction.

"The idea of 'invited response'" does not "excuse improper comments," but it does help us "determine their effect on the trial as a whole." *Darden,* 477 U.S. at 182. We consider not only the "impact of the prosecutor's remarks, but must also take into account defense counsel's opening

salvo." *Young*, 470 U.S. at 12. Here, the state court characterized the "closing arguments of both sides" as "intense." The district court described defense counsel's arguments as "hyperbolic." And the magistrate judge, fully supported by the record, summarized defense counsel's "numerous remarks impugning the conduct and motives of the Hamilton County Prosecutor and attorneys in the prosecutor's office as wrong, unfair, retaliatory, vindictive, politically motivated, arrogant and hypocritical." We examine the four statements Hunter challenges in this light.

Hunter characterizes two of the prosecutor's statements as falsely portraying her "as someone who did not care about victims of crime or children who were abused." The first of these highlighted the criminal conduct of six juveniles whose identities Hunter had sought to protect. But this statement responded almost directly to defense counsel's opening remarks. One of defense counsel's themes was that Hunter was on trial, not for criminal conduct, but for being a "judge who had the audacity . . . to reprimand high ranking officials in Hamilton County" and "challenge influential people." One such group of influential people, the media, had sued Hunter for the right to publish the identities of some juveniles before her court. Hunter's lawyer suggested a profit motive for the suit:

> [Hunter] didn't want juveniles identified by their name under any circumstances. And guess who had a problem with that? The media. They had a problem with that because . . . their crimes were so egregious that we want to protect the public by knowing their name, or . . . we want to sell papers?

In closing, the prosecution echoed defense counsel's words but gave an alternative explanation for the lawsuit: The media thought that the public had a right to know about the juveniles because they were dangerous.

> [Defense counsel] says she didn't want juveniles identified by their names under any circumstances and guess who had a problem immediately? Well, of course, these juveniles just happen to be the six kids who beat some guy up and hospitalized him in North College Hill because they were bored.

Hunter next complains about a statement highlighting her choice of bailiff, a man whom the juvenile court had previously fired for hitting children. The special prosecutor remarked:

> July was not a very good month for Tracie Hunter because . . . her brother beat up an inmate at the detention center. And, of course, it's awfully coincidental when people look at whether Hunter cares if a juvenile gets beat up in the detention center and how much she cares about everybody and her first hire was the bailiff who had been terminated for beating children.

This statement could reasonably be seen as responding to the defense's repeated argument that Hunter—a "deliberate, contemplative and thorough" person whose only care was "the best interest for the children"—had inquired into her brother's incident solely out of concern for the alleged juvenile victim and others at the Youth Center. The prosecution contested this characterization, in part, by pointing out that she had knowingly hired a bailiff with a history of child abuse.

Hunter next contests two statements that insinuated that her delay in ruling on cases left children exposed to sexual abuse in the home. These are the most inflammatory statements before us. But a reasonable jurist could see each as a response to Hunter's theory that the charges against her were motivated by political and personal animosity. Hamilton County Public Defender, Ray Faller, was the subject of one statement. The defense called him a "partisan" witness and suggested that he had lodged a complaint against Hunter and had sought a writ to compel her to timely rule on cases, solely for political reasons. The prosecution gave an alternative explanation:

> Ray Faller, as he told you, we have got children waiting to be adopted. We have got children waiting to go get services. We have got children waiting to be taken out of homes or placed in homes. We have got people who want finality and we can't get her to rule on it.
>
> And the people that are adversely affected can't appeal it because she won't put on the final appealable order, so the child who is still stuck in the home where there is sexual abuse until she—

The next statement, concerning County Prosecutor Joe Deters, can also be seen as offering an alternative to defense counsel's claim that the prosecutor's office had targeted Hunter out of partisan and personal animosity. The investigation into Hunter's conduct began when the prosecutor's office suspected that Hunter was backdating certain documents so that prosecutors would not be able to timely appeal. The special prosecutor noted in closing that county prosecutors were "sworn to protect victims . . . of crime," including "children who are being sexually abused" and "physically abused," and children "in drug-infested homes, who are not being treated properly, who are not nourished." The county prosecutors had a duty to help remove children "from those homes." Hunter's pattern of backdating and delay frustrated that duty. The special prosecutor asked, rhetorically:

> Why can't you get this case resolved?
>
> Maybe that is what Deters has to listen to. Maybe what Deters has to listen to is the social worker who says this child is being sexually abused and we can't get this child out of the home because we can't get Judge Hunter to rule on the case.

The state court did not flout clearly established Supreme Court precedent by concluding that, taken in context, Hunter's counsel invited or "opened the door to" these four short statements, made during a two-day closing argument, at the end of a lengthy and heated trial. Some of the statements might have been unprofessional, or even improper, but the state court did not unreasonably conclude that they were invited and that, taken in context, they did not unfairly prejudice the defendant.

Hunter offers three reasons why the state court was wrong to apply the invited-response doctrine. None persuades. First, she says that the statements in closing could not have been invited because the prosecution introduced two of the ideas in its opening statement: that the jury would hear from witnesses "concerned" that "juveniles were suffering" as Hunter's cases "languish[ed],"

and that Hunter had hired a bailiff who had been fired for "physically abusing a child." But both of these statements simply previewed the evidence to come; neither statement drew an objection and such evidence was admitted at trial. Hunter later objected to the prosecution's *characterization* of this evidence in closing argument. But, as discussed above, each of the prosecution's descriptions of this evidence can reasonably be seen as a response to the defense. Hunter points to no Supreme Court precedent that says the invited-response doctrine is inapplicable when evidence mentioned in the response is first previewed by the prosecution in its opening statements. Second, Hunter argues that her points about political motivation did not give the prosecution *carte blanche* to respond however it pleased. That is true, but the state court did not conclude that the prosecution had *carte blanche*, only that Hunter had opened the door to these particular comments. It wasn't unreasonable for the state court to conclude as much. Third, Hunter argues that she made no improper arguments in the first place, so the prosecution had no need to "right the scale." But the invited-response doctrine may apply when, as here, the defense attacks the prosecution's motivation. *See, e.g.*, *United States v. Lattner*, 385 F.3d 947, 960 (6th Cir. 2004). Hunter points to no Supreme Court case saying otherwise. So these arguments are unavailing.

The state court also concluded that Hunter had not been denied a fair trial because the trial judge told the jury repeatedly that the statements made "in closing argument are not evidence." That conclusion was not an unreasonable application of federal law. *See Darden*, 477 U.S. at 182 (noting that the trial judge "instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence"). Hunter contends that such a limiting instruction is "simply inadequate." But the Supreme Court has blessed this very instruction as an effective tool for curtailing prejudice. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 644 (1974). And when, as here, the court gives a curative instruction

directly after an arguably improper remark, it is even more effective. *United States v. Hall*, 979 F.3d 1107, 1120 (6th Cir. 2020).

In *Darden,* the Supreme Court also considered the effect of any prosecutorial misconduct in light of "the weight of the evidence against petitioner." *Id.* at 182. The state court did not expressly address this *Darden* factor; nor did Hunter raise this factor in state court in connection with her prosecutorial-misconduct claim. Still, she does press it here, suggesting that the evidence against her was weak. But Hunter does little to contest the key points of the prosecution's case: Hunter had emailed the Youth Center on the very day that her brother learned he might be fired, asking for a closed meeting and echoing the same concerns that he had raised in his defense; in a second email, she asked for detailed records of the juvenile involved in the incident; the superintendent of the Center worried about Hunter's conflict of interest and sought clarification, but Hunter persisted with her request for all reports related to the juvenile, from any incident; Hunter passed that information to her brother the night before his termination hearing; and Steven Hunter gave those documents to his attorney, who accepted some but not others because she was concerned that it might be unethical.

Hunter argues instead that she is innocent as a matter of law. Hunter insists that because "she did not secure a contract for her brother," she cannot be guilty. But the state court did consider this argument and squarely rejected it, concluding that the statute criminalizes "not only interference with the initial decision to employ a family member, but also extends to other areas of employment, including termination proceedings." On habeas review, we are bound by a state court's ruling on matters of state law. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Hunter hasn't demonstrated that the state court's rejection of her prosecutorial-misconduct claim unreasonably applied clearly established Supreme Court precedent, which is what AEDPA

requires. That said, we agree with the district court that the standard makes no difference to the outcome here. The district court's careful analysis convinces us that Hunter would not be entitled to relief even under de novo review.

* * *

We AFFIRM.